INTERNATIONAL VITAMIN CORPORATION v. E. R. SQUIBB & SONS.

No. 5409.

District Court, E. D. New York.

June 3, 1932.

Satterlee & Canfield, of New York City (R. Randolph Hicks, Albert M. Austin, and Reuben T. Carlson, all of New York City, of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (George F. Scull and Charles W. Mortimer, both of New York City, of counsel), for defendant.

GALSTON, District Judge.

This is a suit in which infringement is alleged of letters patent No. 1,690,091, granted October 30, 1928, to Joseph K. Marcus, for a process for extracting the nonsaponifiable and "difficulty-saponifiable" matter from fatty material. Although some prior art is referred to, the sole defense is noninfringement.

The art involved is one of extreme interest. It relates to the process of extracting vitamins from fatty materials. The specification states that various animal and vegetable oils and fats contain vitamins which are removable by extraction "together with the other non-saponifiable and difficulty-saponifiable matter of said material."

The objects of the invention are stated to be an improved process for treating fish liver oils, such as cod liver oil; to provide a process in which the nonsaponifiable matter can be extracted from the alkali soap of the fatty material directly, without either drying the soap or dissolving it in water, and with the avoidance of emulsions. Other objects are the elimination of inflammable solvents and the use of smaller volumes of water and alcohol as compared with other known processes.

The four claims of the patent are in issue. The first, third, and fourth are for a process; and the second claim is for a step in the process. This claim is the broadest of the first three claims, and reads: "2. A step

in the process of extracting nonsaponifiable and difficulty-saponifiable matter from fatty materials, consisting in treating a viscous solid alkali soap formed from said material with ethylene dichloride to extract said matter."

The controversy in respect to infringement centers about the meaning of the expression "viscous-solid" as applied to alkali soap, for the defendant does make an alkali soap formed from cod liver oil and treats that soap with ethylene dichloride.

It will, perhaps, facilitate an understanding of this question critically to examine the specification in order to determine how viscous-solid soap is defined therein.

On page 1, lines 22 to 25, inclusive, the patentee states, referring to the extraction of the vitamins from the alkali soap of the fatty material, "without either drying the soap, as formed, to remove its water, or dissolving it in water to form a solution," and adds, "with the avoidance of troublesome emulsions."

It is contended by the plaintiff that the viscous-solid soap of the patent is, therefore, a soap which is neither a dried soap nor a liquid soap, and that a soap between these two limits is the viscous-solid soap of the patent.

Confirmation of this view is apparently afforded in the passage on page 1, lines 53 to 59 of the specification, in which, in referring to the known art, it is said: "Heretofore the method of preparing the alkali soap of an oil for extraction of the unsaponifiable matter has been either by (a) dissolving the soap in a large excess of water, or (b) converting the alcoholic soap solution to dry soap by distilling off the solvent and drying the residue."

This is an important passage, because from the testimony of the patentee Marcus it appears that the object of the patent could not be attained if either a soap solution or a dry soap were used with the reagent ethylene dichloride to effect the extraction, for both of such forms of soap, when treated with ethylene dichloride, will produce emulsions. On the other hand, the viscous-solid soap of the patent lying between these two limits, when treated with the patentee's reagent, will not produce emulsions, but will enable the extraction successfully to be made.

Furthermore, it is apparent that the viscous-solid soap of the patent is an alkali soap mixture with a required content of water and alcohol. The patentee says: "After saponification is complete the water and alcohol content of the alkali soap mass is adjusted so that about 60 grams of 30 percent aqueous alcohol is present for each 100 grams of oil saponified."

Two methods are suggested by which such an alkali soap mixture can be obtained:

"(1) Saponifying the cod liver oil with alcoholic potash in the well known proportions, distilling off the excess alcohol after saponification is complete, and then adding the required amount of water, or

"(2) saponifying the cod liver oil with less alcohol than necessary to form a homogeneous solution of the reaction mixture (e. g. an amount of 50 percent aqueous alcohol equal to 40 percent of the weight of cod liver oil treated), and then adding the required amount of water after saponification is complete. Method (2) eliminates the operation of distilling off alcohol."

With either method the cod liver oil is converted into a "viscous-solid mixture" which can be extracted with ethylene dichloride, and without "either drying the soap to remove its water or dissolving the soap in water."

Additional description is given in the following phrase: "Viscous-solid soap designates a soap mass that contains a substantial amount of water which, as it varies, changes the state of the soap from a soft semi-solid to a hard solid in contradistinction to the dry solid soap obtained by drying the soap mass."

From the foregoing, it seems to me there is a sufficient disclosure in the patent to indicate to those skilled in the art what the patentee meant by the words "viscous-solid." A patentee, of course, is entitled to use his own words to define his invention providing such definition sufficiently instructs those skilled in the art. Rajah Auto Supply Co. v. Belvidere Screw & Machine Co. (C. C. A.) 275 F. 761; Jones v. Sykes Metal Lath & Roofing Co. (C. C. A.) 254 F. 91, and Victory Belt Co. v. Marshall Field & Co. (C. C. A.) 300 F. 67.

With that understanding of the meaning of the term, we can more intelligently examine the defendant's process.

The defendant saponifies cod liver oil by the use of sodium in the presence of alcohol and water, but chiefly of alcohol. So far as soap making is concerned that process was old. Its next step is to take the soap solution and pour it into a brine solution and add sodium chloride, to cause a precipitation of the sodium soap. The soap precipitate is in

the form of a curd which commonly flows to the top. The soap is then drained.

The question is whether this soap after the extraction is made is a viscous-solid soap. The defendant contends that it has a hard soap such as the Zucker soap of the prior art. But there is serious question whether this is so. Zucker adds a calcium chloride to a sodium soap and converts it into a calcium soap. Zucker thus introduces a chemical reaction. The defendant's soap is a sodium soap and, unlike Zucker's calcium soap, is soluble in water. Zucker's is an alkaline earth soap and is not soluble in water.

That the Zucker calcium soap and the defendant's sodium soap have different chemical properties is, of course, evident, too, by the tests of extraction made with ethylene dichloride. The former emulsified, whereas the defendant's soap was successfully extracted with that reagent.

Again, the quantities of water and alcohol found in the samples of the defendant's soap would appear to fall within the limitations of the aqueous alcohol content of the soap of the patent in suit. One sample, as testified to by Dr. McKee, plaintiff's expert, showed a loss of 50.4 per cent. on drying, which he said would represent the sum of alcohol and water present. His analysis showed 29.4 per cent. of alcohol. The second sample showed the sum of water and alcohol to be 46.3 per cent. Dr. McKee described the materials as soft soaps, slightly granular, since the soap was not potassium, but sodium. The defendant's soap has the same character of consistency, except that it is granular, as that of the patent.

It is difficult to see how the defendant's soap with its water and alcohol content, and responding as it does to the extraction with ethylene dichloride, escapes the patentee's classification of viscous-solid soap.

Nor does the defendant, by employing a different method in making its soap from that of the patent, escape from the limitations of claim 2, since the two products within the definition of the product are equivalents of each other.

Some reference is made in the specification to a potash soap. There is no contention that within the teaching of the patent a sodium soap is not its equivalent. Dr. Black, the defendant's expert, so testified.

For the foregoing reasons I believe claim 2 to be infringed; and likewise claims 1 and 3.

Claim 4 is in some respects broader than the other three claims. It reads: "The process of extracting the vitamin contents from oil, consisting in saponifying the oil with an alkali in the presence of aqueous alcohol to form a soap and extracting said contents from the soap with ethylene dichloride, the aqueous alcohol content of the soap at the time of extraction being relatively less than the oil treated."

It is to be noted that this claim calls for an aqueous alcohol content of the soap "relatively less" than the oil treated. Dr. Black, for the defendant, testified that the defendant's soap at the time of extraction carries from 50 to 75 per cent. of liquid and that it is invariably above 50 per cent.

According to the defendant's answers to plaintiff's interrogatories, defendant's total soap mixture amounts to 23.13 pounds from 7.7 pounds of cod liver oil. This ratio differs from a ratio indicated in the Marcus patent, which has been calculated to be 2.1 to 1. On the basis of the analysis of the actual soap samples furnished by the defendant, Dr. McKee's analysis showed a total liquid content of 46 per cent. (water and alcohol) as against 62 per cent. set forth in the answer to the interrogatories.

But the defendant points out, and I think with the weight of reason, that one cannot take any part of the contents of the sample furnished and convincingly contend that such part contains the same proportions of liquid and solid as in the whole manufactured product. I think plaintiff's proof of infringement falls short as to claim 4.

I may say in conclusion that I examined with considerable care defendant's argument of estoppel alleged to be disclosed by a critical reading of the file wrapper. I think, however, it is a sufficient answer to point out, as the plaintiff does, that claim 6 of the original application, now claim 3 of the patent, was allowed exactly as filed.

Plaintiff may have a decree.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.